Francis E. Fowler, Jr. v. Commissioner.
Fowler v. Commissioner
Docket No. 5850.
United States Tax Court
1945 Tax Ct. Memo LEXIS 193; 4 T.C.M. (CCH) 520; T.C.M. (RIA) 45176; May 16, 1945
Jerome F. Duggan, Esq., for the petitioner. Gene W. Reardon, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of deficiencies in his income tax for the years 1939, 1940, and 1941, in the amounts of $523.11, $19,588.81, and $64,639.38, respectively. Petitioner has conceded all the assignments of error for the taxable year 1939, and all other issues in controversy for the years 1940 and 1941, except (1) whether he is entitled to report his salary and commissions for those years on a community property basis, and (2) whether the income for 1941 of an enterprise alleged to have been transferred by petitioner to his three sons is attributable to *194 petitioner. Findings of Fact Petitioner filed his Federal income tax returns for the year 1939 with the collector of internal revenue for the first district of Missouri, and for the years 1940, 1941, 1942, and 1943, with the collector of internal revenue for the sixth district of California. The Commissioner's notice of deficiency asserting the income tax deficiencies in controversy was issued from the internal revenue agent's office, St. Louis, Missouri. Petitioner was born in St. Louis, Missouri, in 1891 and attended school there. In 1916 he was married in St. Louis, spent his honeymoon in Bermuda, and has lived continuously with his wife ever since. They have three sons, Francis E. Fowler, III, Truman R. Fowler, and Philip E. Fowler, who became 23, 20, and 17 years of age, respectively, in 1940. About 1920 petitioner purchased a home comprised of ten rooms and three baths at 63 Kingsbury Place, St. Louis, Missouri, for $33,000. Petitioner's St. Louis home was furnished at a cost of not less than $7,000, some furnishings replaced and augmented from year to year. A part of the furnishings were gifts from his wife's family who were people of wealth. Petitioner has made improvements *195 upon his home in St. Louis extending over a period of years. He has always kept the house completely furnished. He has never rented the house nor has anyone but petitioner and his family ever lived there. He listed the property for sale in 1939 with an agent in St. Louis who is now deceased. Petitioner and his family have lived in their St. Louis home from time to time while not traveling or stopping at the home maintained by petitioner at La Jolla, California. As late as November, 1944, petit oner and his wife were living in their St. Louis home. He has been listed in the St. Louis phone directory at 63 Kingsbury Place ever since he bought the house. Petitioner also owns other houses in St. Louis, Missouri, in addition to the one in which he and his family live. Petitioner has a chronic throat ailment for which specialists recommended a change of climate. Philip was ill with bronchitis in 1929 and the doctor prescribed a change of climate. In 1929 petitioner first visited California and at that time purchased a house at La Jolla, California. Petitioner and his family decided to spend more time at the California house, and in 1935 made a five-room addition thereto. Petitioner also *196 acquired a 15-room house on adjoining property. The California home is built on a hillside facing the Pacific Ocean, and petitioner's property there covers several acres of ground, improved with shrubbery, trees, and flowers. There is no mail delivery to the house and any mail addressed to petitioner at La Jolla is delivered to a post office box number there in his name. In 1929 petitioner acquired a life membership in the La Jolla Beach and Yacht Club, and at that time he also purchased a large motor boat which he later sold. The club had swimming as well as boating facilities which were availed of by petitioner and his family and guests. In 1939 petitioner and his wife took some of their best silver and linen to La Jolla. La Jolla, California, until the recent influx of army camps, was a resort town where a number of families from St. Louis spent their vacations. It is 115 miles from Los Angeles and 15 miles from San Diego. Petitioner's family has a summer home in Michigan which petitioner has the right to use. He has not done so since 1928 and the place is now for sale. In 1858 petitioner's grandfather established a general insurance agency in St. Louis, Missouri. This business *197 was continuously carried on by petitioner's father under the name of F. E. Fowler & Co. for 50 years prior to his retirement in 1930, at which time the business was given to petitioner who has continuously carried on such business of being insurance broker and agent under the same family name. The offices of the business are in the Pierce Building, St. LouisMissouri. Petitioner has never conducted any insurance business in the State of California, although the company did an insurance business all over the United States, including accounts in California. Petitioner became interested in the fruit extract business in 1926. He started a sole proprietorship under the name of The Caligrapo Company, which is an abbreviation for California Grape Products Company, with its business address in the Pierce Building, St. Louis, Missouri. Petitioner carried on experiments in St. Louis and California with various fruits and in connection therewith developed secret formulas for the making of flavoring extract concentrates. This business of producing flavoring extracts has been continuously carried on from St. Louis, Missouri, under the above trade name. The Southern Comfort Corporation was organized *198 by petitioner in 1934, and engages in the manufacture of liquor products in St. Louis, Missouri. Its business address is Pierce Building, St. Louis, Missouri. It is controlled by petitioner who since its incorporation has been its president and general sales manager. The direct employees of Southern Comfort Corporation are all located in St. Louis, Missouri, and it carries on its selling business through individual representatives or brokers throughout the United States who sell its products on a commission basis in various designated territories. These commission men personally take up all important business matters with petitioner as president of Southern Comfort Corporation. They carry on correspondence with the corporation and petitioner at La Jolla, St. Louis, Los Angeles, and elsewhere, and personally confer with petitioner in California, St. Louis, and elsewhere. Petitioner and his sons have engaged in the hobby of collecting rare firearms and other weapons. Petitioner has a large and valuable collection assembled at his home in St. Louis. Petitioner also had specimens arranged in his home at La Jolla but found the sea air damaged them so he sent them to St. Louis. Petitioner *199 has held himself out as a dealer in antiques, including the guns and English silver. He has articles out on consignment in St. Louis and in California. He has never sold any antiques at a profit. In the spring of 1936 petitioner's father died in a hospital at La Jolla, California. Funeral services were conducted in St. Louis, Missouri, reported in a local paper to be "at the home of F. E. Fowler, Jr., 63 Kingsbury Place" and the body was interred in the family plot in Calvary Cemetery, St. Louis. The estate of petitioner's father was administered by the St. Louis Union Trust Company of St. Louis, and a final settlement of $3.67 was made July 6, 1939. Petitioner's three sons attended grade school in St. Louis and on occasion went to school in California. They all finished their grade school education and completed their four years of high school in St. Louis, Missouri. The oldest son went to college in St. Louis and graduated from Washington University there in 1937. While there he made his home at 63 Kingsbury Place. The second son went to Colgate University in New York in 1940 and 1941. The youngest son was still going to high school in St. Louis, Missouri, during the year 1940. *200 He completed his high school education there in June of 1940. He later graduated from Colgate University in 1944. Except for the time they were attending college, the three sons lived at 63 Kingsbury Place, St. Louis, Missouri, during the taxable years 1940 and 1941. At times when the petitioner and his wife were not present the children were supervised by the oldest son or by an aunt in St. Louis. Sometimes they stayed with relatives in St. Louis. Petitioner and his wife have maintained a single bank account in California which is a personal joint checking account with a bank in La Jolla, and is used for living expenses. Salary checks from Southern Comfort were deposited in the account. It has been an active account for the past 15 years. Petitioner has always maintained bank accounts with local banks in St. Louis, including a business account for the insurance company, and during the years 1940 and 1941 he had personal accounts in two separate banks in St. Louis, and a joint personal account in a third St. Louis bank, against which his wife does not draw. His wife also has maintained a separate personal account with a fourth St. Louis bank. Petitioner has maintained and used charge *201 accounts from the time of his marrlage to the present date with various stores in St. Louis. He also maintains charge accounts with stores in Los Angeles, San Diego, New York. Chicago, Philadelphia, and in Massachusetts. Petitioner travels extensively throughout the United States in connection with the business of Southern Comfort Corporation and his wife always accompanies him on such trips, as she has done since their marriage. He usually makes a trip across the United States about twice a year. He gave 63 Kingsbury Place, St. Louis, as his address when registering in hotels in the East during 1940 and 1941. Petitioner and his wife, since 1929. have each year spent part of their time in their home at St. Louis and part of their time in their home at La Jolla. Petitioner and his wife spent Christmas of the year 1941 at St. Louis. Petitioner has many life-long friends in St. Louis. Sometime after March, 1929, petitioner regarded Missouri as his legal residence. In 1939 he moved additional personal effects to California, built a concrete driveway at the California home, and made additional plantings there. Petitioner owned about six personal automobiles in addition to business *202 cars in the years 1939 through 1941. Some of the personal cars carried Missouri plates and were kept in St. Louis, and others carried California license plates and others carried California license plates and were kept in La Jolla. Petitioner holds a California automobile operator's permit. Petitioner had a caretaker continuously in his home in St. Louis, and at the time of the hearing in late 1944 had a caretaker and gardener at the home in La Jolla. Their maids usually accompanied them on their trips between St. Louis and La Jolla, and in November, 1944, petitioner had two maids in his St. Louis home. Petitioner and his wife had been issued war ration books from the rationing boards of St. Louis and California. Petitioner made application for fuel oil in 1942 with the Fuel Oil Division of the City Ration Board for 63 Kingsbury Place. Petitioner registered for the draft in California. Petitioner has paid real property taxes to the City of St. Louis for each of the years 1940 and 1941. In 1940 he received an assessment notice for a Missouri state income tax deficiency for 1936, addressed to him at La Jolla. In 1939 petitioner's wife received a communication from the Missouri *203 state auditor with reference to her 1936 income tax. In 1941 petitioner paid 1938 Missouri income tax, the statement having been sent him at La Jolla. In 1940 he made a California income tax return. Petitioner carries identification and credit cards on his person, including San Diego Yacht and La Jolla Beach Club cards; Chamber of Commerce of La Jolla; Blackstone and Drake Hotel cards issued to him as president of Southern Comfort of St. Louis; Los Angeles jewelry credit card; St. Louis Chamber of Commerce (in his name, but intended to be on behalf of Southern Comfort); social security and draft cards, giving California address; old permit to carry a gun giving St. Louis address; a membership card of a St. Louis Chapter of War Dads; an insurance identification card, which was about 18 years old, giving his St. Louis address; a Statler Hotel card, giving his St. Louis address; and a Coronado Hotel card, giving his St. Louis address, which has been periodically reissued to him. He is also a member of the University Club in St. Louis which has privileges in other cities. Petitioner did not vote in either St. Lou's. Missouri, or La Jolla. California, during the years 1938 to 1941, *204 inclusive. After establishing a home in California petitioner took steps to have his name removed from the jury list in St. Louis. From the time petitioner began filing individual Federal income tax returns and through 1938 he filed his returns with the collector of internal revenue, St. Louis, Missouri, giving his address as 63 Kingsbury Place. Petitioner filed a separate income tax return for the year 1939 on March 15, 1940, with the collector of internal revenue of St. Louis in which he listed 63 Kingsbury Place as his address. Petitioner and his wife each filed separate Federal income tax returns for the taxable year 1940 on March 6, 1941, with the collector of internal revenue. Los Angeles, California. in which they each included in their respective taxable income one-half of petitioner's reported salary and commissions from Southern Comfort Corporation and commissions from petitioner's insurance business. The income from petitioner's flavoring extract business for the year 1940 which was carried on under the trade name of The Caligrapo Company was not reported on a community property basis but was all included by petitioner in his taxable income for that year. On March 16, 1942, petitioner *205 and his wife each filed separate Federal income tax returns for the taxable year 1941 with the collector of internal revenue, Los Angeles, California, in which they each included in their respective taxable incomes one-half of petitioner's reported net salaries and commissions from Southern Comfort Corporation and commissions from petitioner's insurance business. The returns for 1941 were notarized in St. Louis on March 12, 1942. Petitioner's three sons each filed individual Federal income tax returns for the year 1941 on March 14, 1942, with the collector of internal revenue, St. Louis, Missouri, in which returns they reported the income from The Caligrapo Company on an equal partnership basis. In each such return the respective sons gave their address as 63 Kingsbury Place. Petitioner was domiciled in the State of Missouri rather than the State of California during the taxable years 1940 and 1941. Petitioner experimented for many years with the product of fruit flavoring extracts and in 1926 he started selling his product which was then a non-alcoholic flavoring and operated under the trade name of The Caligrapo Company as a sole proprietorship. The business offices of The Caligrapo *206 Company have at all times been maintained in the Pierce Building, St. Louis, Missouri. Its manufacturing plant was located at 319 Chestnut Street, St. Louis, and a laboratory was located in the home maintained by petitioner in La Jolla. About 1929 petitioner experimented with the planting of trees and shrubbery in California. He developed an extract concentrate from the fruits which was used to flavor non-alcoholic beverages. In 1934 petitioner discovered a secret formula from which he produced an alcoholic flavoring. This he transferred to Southern Comfort Corporation in exchange for stock. Petitioner developed a new formula that same year which he also conveyed to Southern Comfort. The flavoring was used in the blending and manufacturing of Southern Comfort, an alcoholic beverage. In the spring of 1941 Caligrapo announced the production of a superior flavoring concentrate, result of a new secret formula developed by petitioner's oldest son while he was being employed by The Caligrapo Company. He worked on it for almost a year. The experimental and research work was carried on at the plant in St. Louis and in California. The new product was a superior one in that it could be mixed *207 by anyone, and did not require ingredients made non-obtainable by the war. The Southern Comfort Corporation did not know the secret process for the making of this concentrate. The concentrates in question were produced by The Caligrapo Company and sold principally to the Southern Comfort Corporation from 1934 through 1941 and were used by it in the manufacture of Southern Comfort. The sales of Caligrapo increased from $10,593.99 in 1939 to $25,928.73 in 1940, and $74,188.30 in 1941. In 1940 the cost of production was $16,844.03 and in 1941 the cost of production was $13,993.59. The selling price to Southern Comfort of the secret extract concentrate produced by Caligrapo was double that of the extract previously sold to Southern Comfort. Petitioner's three sons, two of whom were minors, aged 20 and 17, respectively, and were attending school in 1940, signed a "Partnership Agreement," dated January 1, 1941. The indenture was not signed by petitioner; it was not witnessed; and has not been placed on public record. It recited that "on December 10, 1940, FRANCIS E. FOWLER, JR., decided to give as a gift to his three sons, FRANCIS EDWIN FOWLER, III, TRUMAN RIDDLE FOWLER and PHILIP *208 FOUKE FOWLER, a company known as the CALIGRAPO COMPANY, in equal shares and to them as a partnership * * *." The assets and liabilities of Caligrapo on December 31, 1940, were listed as follows: Assets
Accounts Receivable
$3,311.00
Notes Receivable
2,000.00
Cash on deposit
2,914.13
Petty Cash
15.60
Exchange A/c - due from Southern
Comfort
99.63
Factory Equipment
151.90
Insurance Unexpired
96.83
Merchandise Inventory
1,806.28
Loans Receivable, Southern Comfort
480.96
Loans Receivable, Emp.
2.30
Office Equipment
152.36
Traveling Expense - deferred (Cadil-
lac)
1,200.00
Total Assets
$12,230.99
Liabilities
Insurance Payable
$ 52.72
Philip Fowler, Photography,
1940
255.00
Meyer Bros.
20.10
Polabs
273.24
Angosturas
181.30
Total Liabilities
782.36
NET WORTH
$11,448.63
The "Partnership Agreement" signed by the three sons reads in part as follows: "THIS INDENTURE made this 1st day of January, 1941, by and between Francis Edwin Fowler, III, Truman Riddle Fowler and Philip Fouke Fowler, IT IS MUTUALLY AGREED AND UNDERSTOOD by and between the respective parties hereto that they will become and remain partners in the *209 business of the Caligrapo Company for a term of fifty (50) years from the date of these presents, if all of them shall so long live. "2.) It is further mutually agreed and understood by and between all the parties hereto, that the partnership shall terminate at the end of ten (10) years from the date of these presents, if any one of the partners shall desire its termination, and such partner or partners desiring the termination, shall give not less than six months previous notice in writing to the other partner or partners. "3.) It is further mutually agreed and understood by and between the respective parties hereto that the firm name of the partnership shall be THE CALIGRAPO COMPANY. "4.) It is further mutually agreed and understood by and between the respective parties hereto, the business of the partnership shall be carried on at the Pierce Building, St. Louis, Missouri, or at such other place or places as the partners shall hereafter determine. "5.) It is further mutually agreed and understood by and between the respective parties hereto, that all of them will at all times diligently apply themselves to the business of the partnership and carry on the same to the greatest *210 advantage of the partnership and each individual member thereof. * * * * *
"7.) It is further mutually agreed and understood by and between the respective parties hereto, that the capital of the partnership shall consist of the sum of $11,448.63, consisting of various property including cash on hand amounting to $2,929.93, which is contributed to the partnership in equal shares by the respective partners. * * * * *
"12.) It is further mutually agreed and understood by and between the respective parties hereto, that the partners shall be entitled to the net profits arising from the said business, and remaining after the payments hereinbefore directed to be made thereout, in equal shares. * * * * *
"14.) It is further mutually agreed and understood by and between the respective parties hereto, that the bankers of the partnership shall be the Boatmen's National Bank of St. Louis, or such other bank as the partners shall from time to time agree upon; and all partnership moneys (not required for current expenses) shall be paid into the account of the firm at the said bank at the end of every month. Each partner shall be at liberty to draw on the partnership account, *211 but only for the purposes of the partnership, or for the purposes mentioned in the next clause hereof [unavoidable partnership obligations], and only by drafts or checks upon such bank in the firm name." Under paragraph 17 of the "Partnership Agreement" it was provided that Francis E. Fowler, III, shall be manager of the business and paid an annual salary of $2,400 for his services. Under paragraph 22 of the indenture it was stated that each of the partners shall be entitled to one-third of the profits and that the losses shall be borne by each in the same proportion. Paragraph 24 of the indenture stated that the profits were to be credited on the books at the end of each year to the respective accounts of the three partners and "may be drawn out at pleasure." The instrument contained additional formal provisions with respect to the payment of partnership expenses, restrictions upon the powers of the partners to obligate the firm, maintenance of books of account, limitations upon the signing of checks and writings, and upon the right of the partners to engage in any other business or to divulge trade secrets. It also contained provisions with respect to the assignment of partnership *212 interests and the division of funds in case of dissolution. Under paragraph 30 of the indenture it was provided that in the event of disagreement between the partners as to their rights or liability under the terms of the indenture, "such difference shall be determined and such instrument or instruments shall be settled by Francis E. Fowler, Jr., [petitioner] and his decisions shall be final as to the contents and interpretation of such instrument or instruments, and as to the proper mode of carrying the same into effect." Petitioner did not file a Federal gift tax return reporting the alleged gift of The Caligrapo Company to his three sons. For the month of January, 1941, and prior thereto petitioner and the cashier of Caligrapo, under a power of attorney, were solely authorized to issue checks against the bank account of Caligrapo with the First National Bank in St. Louis. On January 31, 1941, petitioner requested the First National Bank in St. Louis to transfer all funds then on deposit to the credit of his three sons, and on February 1, 1941, the bank advised petitioner that the funds had been so transferred. On and after February 1, 1941, each of petitioner's three sons *213 or the cashier of Caligrapo was authorized to issue checks against the bank account of Caligrapo First National Bank. The Caligrapo Company opened a "partnership" general ledger book as of January 1, 1941, and set up capital accounts wherein the purported net worth of the business in the sum of $11,448.63 was evenly divided among petitioner's three sons. The Caligrapo Company for the year 1941 shows withdrawals of $3.00 and salary of $600 paid to Truman, withdrawals of $38.64 and salary of $600 paid to Philip, and withdrawals of $237.78, and salary of $2,400 paid to Francis III. No other withdrawals or disbursements of the earnings of Caligrapo for the year 1941 were made to the three sons of petitioner. During the years 1940 and 1941 Caligrapo had only one full-time employee and two part-time employees. Petitioner was not an employee. Opinion Petitioner claims to be domiciled in the community property state of California, and hence to have correctly computed his tax liability by including only half of the community income in his own return. That presents the first issue. There is no question that petitioner was originally a resident of St. Louis; that he owns a large residence *214 there; that he has business interests in that city; that his children have attended school there, even during the years in question; and that he has retained St. Louis bank accounts and charge accounts. Petitioner urges that a large part of each year is spent in California. It also appears that he and his wife have spent a part of their time in St. Louis in every year. He points out that he has business quarters in California, and that he handles his affairs from there by correspondence and sometimes personal interviews, but it also appears that his business associates confer with him in St. Louis when he is there. It is shown that a caretaker has charge of the St. Louis home, but it also appears that when petitioner and his wife are absent from California a caretaker is also employed there. Petitioner registered for the draft in California but he and his wife have been issued war ration books both in Missouri and California and a fuel oil application for the St. Louis residence was made to the St. Louis Ration Board. Petitioner belongs to clubs and business organizations in California, but he also belongs to a club in St. Louis and to the St. Louis Chamber of Commerce. Petitioner *215 did not vote in St. Louis in 1940 or 1941, the years in question, but neither did he vote in California. The California abode had been owned by petitioner for some time. It appears to have been in the nature of both a summer and winter resort. He had used it for annual visits of long duration in prior years and in fact there is some indication that he contends it was his domicile in years prior to 1936, although apparently throughout that period his income tax returns were filed in St. Louis. [1] At any rate we are not able to discern a tangible distinction between his conduct in 1939 when he claims to have taken up the new residence and the customary activities of other years both before and after. To indicate how neutral are all the circumstances, the question might be posed in the following form: Taking all the facts shown by the record, but omitting only petitioner's own statement as to his intention, would anyone be even mildly surprised *216 to learn on those facts that he intended to retain the domicile in St. Louis? Since petitioner concedes that he was domiciled in Missouri up to 1939, since it is incontestable that one claiming a change of domicile has the burden and must meet it by a fair preponderance of the evidence, see Samuel W. Weis 30 B.T.A. 478, 487, and since the mere statement of a wholly mental condition on petitioner's part is not only subject to the infirmities of a self-serving declaration but must in this type of case be accompanied by actions [2] which conform in tenor and coincide in time with the requisite mental attitude, Gilbert v. David, 235 U.S. 561, it seems to us unanswerable that on this record the acts of petitioner are no less consistent with a retention of the Missouri domicile than with the acquisition of a new one in California and hence that at least for the years before us and on the present record it cannot be said that respondent erred in this respect. Shilkret v. Helvering (C.A.D.C.), 138 Fed. (2d) 925. *217 On the question of the income of the flavoring extract business, this proceeding seems to us less favorable to respondent's contention than any submitted by the parties as authority. In all of them the taxpayer concerned had retained an interest in the enterprise and a more or less unqualified management of it. Here petitioner completely eliminated himself from the business and as far as the record shows transferred it in its entirety to his three sons. It is perhaps arguable that the only one of them who was actually responsible for the subsequent operation of the venture or who made any real contribution to it was the oldest boy; it may even be that the other two brothers were no more than recipients of a share of the income. But if so, it was not income earned by petitioner either directly or indirectly, and we need not concern ourselves with the question of a proper distribution of the income for tax purposes among the three sons since none of them is here. Shortly after the transfer to petitioner's three sons a new formula, developed by the oldest boy, was substituted for the one previously used, and it appears that it was superior to the latter and was the exclusive property *218 of the new partnership. But even if the circumstances in this respect were less auspicious and petitioner's company favored the new partnership with orders purely as a matter of partiality, we should not regard it as warranted to carry the "section 22(a)" argument so far as to hold that income which petitioner made it possible for his sons to earn was thereby converted into his own income. The portion of the deficiency dependent upon this issue is disapproved. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code, section 53(b)(1). "Returns * * * shall be made to the collector for the district in which is located the legal residence or principal place of business of the person making the return * * *."↩
2. "* * * 'But mere residence elsewhere will not rebut the presumption as to continuance, unless it is inconsistent with an intent to return to the original domicile.'" Pietro Crespi, 44 B.T.A. 670, 674↩.